Filed 9/10/21  In re B.D. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.D., a Person Coming Under the Juvenile Court Law. | |
| S.D.,<br><br>    Petitioner and Respondent,<br><br>        v.<br><br>K.T.,<br><br>    Objector and Appellant. | F082370<br><br>(Super. Ct. No. BAT-19-003061)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Jerold L. Turner, Judge.  (Retired Judge of the Kern Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.

Darling & Wilson and Joshua G. Wilson, for Petitioner and Respondent.

-ooOoo-

S.D., respondent and guardian of minor B.D., petitioned the court to free then three-year-old B.D. from the custody and control of his biological parents to enable her to adopt him pursuant to Family Code section 7800 et al. and Probate Code section 1516.5. The court granted the petition following a contested hearing. K.T., B.D.'s biological mother, appeals the judgment. She contends the court reversibly erred by (1) failing to read and consider the family court services investigator's report and (2) failing to appoint counsel for B.D. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2017, appellant[1] left then one-and-a-half year old B.D. in the care of respondent, B.D.'s paternal aunt, because she was struggling with substance abuse problems and was planning to undergo rehabilitation treatment. Appellant gave consent for respondent to become guardian of B.D., and letters of guardianship were granted on September 5, 2017. Appellant visited with B.D. in August 2017, but did not return B.D. to respondent's custody at the agreed upon time, and respondent did not thereafter allow any visitation between appellant and B.D.

In March 2019, appellant filed petitions for visitation and to terminate the guardianship in the related guardianship case alleging that respondent had not allowed her to visit B.D.

On May 15, 2019, respondent filed a petition to declare B.D. free from parental custody and control alleging the parents had abandoned B.D. within the meaning of Family Code section 7822, initiating the underlying case.[2] The petition maintained that

---

[1] B.D.'s biological father did not contest the underlying petition and is not a party to this appeal. We omit facts pertaining to him as they are not relevant to the issues on appeal.

[2] A court may declare a child free from parental custody and control if the parent has abandoned the child. (Fam. Code, § 7822; *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010.) Abandonment may occur when, as relevant here, "[t]he child has been left by both parents … in the care and custody of another person for a period of six months without any provision for the child's support, or without communication from the … parents, with the intent on the part of the … parents to abandon the child." (Fam. Code, § 7822, subd. (a)(2).) "'The

as the parents had failed to visit, communicate with, or provide support for B.D. for a period in excess of the statutory period of six months, the legal standard for abandonment had been met.

On July 9, 2019, respondent filed an amended petition alleging an alternate ground authorizing the court to free B.D. from his parents' custody and control under Probate Code section 1516.5.[3]  In addition to the previously alleged facts, the amended petition further alleged the parents did not have legal custody of B.D., B.D. had been in respondent's custody for a period of no less than two years, and B.D. would benefit from being adopted by respondent.

A report prepared by a Family Court Services investigator was filed on September 13, 2019.  Respondent reported to the investigator that B.D. was deaf in both ears, had cochlear implants, and required frequent neurological checkups.  He saw a speech therapist and struggled with behavioral issues.  His hobbies included soccer and swimming.  Respondent reported, that since leaving B.D. in her care, appellant had called and texted every three to six weeks requesting information about B.D. or to see B.D. Respondent periodically checked appellant's social media and saw posts of her drinking

---

failure to provide … support, or failure to communicate is presumptive evidence of the intent to abandon.  If the … parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the … parents.  In the event that a guardian has been appointed for the child, the court may still declare the child abandoned if the … parents have failed to communicate with or support the child within the meaning of this section." (*Id.*, subd. (b).)  "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68.)

[3]     Probate Code section 1516.5 authorizes termination of parental rights if (1) one or both parents do not have the legal custody of the child, (2) the child has been in the physical custody of the guardian for a period of not less than two years, and (3) the court finds the child would benefit from being adopted by his or her guardian.  In determining whether the child would benefit from being adopted by his or her guardian, the court shall consider "all factors relating to the best interest of the child" (*id.*, subd. (a)(3), including but not limited to, the nature and extent of the relationship between all of the following:  the child and the birth parent; the child and the guardian, including family members of the guardian; the child and any siblings or half siblings.

and partying. While respondent shared photos and information with appellant, she did not allow visitation because she believed it was in B.D.'s best interest "due to the inability of [appellant] to maintain sobriety or to provide a safe and stable place to take the child." She further reported B.D.'s "needs for constant monitoring and patience was not compatible with [appellant's] capabilities and unstable lifestyle." Respondent further reported declining appellant's offers of clothing, telling her "everything was taken care of already."

Appellant reported to the investigator that in July 2017 she agreed respondent was the best choice to care for B.D. due to appellant's alcohol abuse. After signing consent to the guardianship, appellant stated she successfully completed a rehabilitation program in Nevada. Appellant further reported that respondent did not allow any visitation, and she felt it hindered her ability to form a relationship with B.D.

The investigator did not interview B.D. "due to [B.D.'s] hearing difficulties, his vocabulary, which is approximately 12 words that he communicates by sign language and the lack of contact with the parents as reported by the guardian and the parents."

The investigator's recommendation was to deny respondent's petition as to appellant. As to Family Code section 7822, the investigator concluded the allegations did not appear to be true nor meet the legal standards of abandonment. The investigator noted appellant made repeated efforts to see B.D. and respondent denied visitation and acknowledged refusing any form of support from appellant. As to Probate Code section 1516.5, the investigator concluded it was not in B.D.'s best interest for appellant's parental rights to be terminated, noting appellant appeared to have had a relationship with B.D. and attempted to maintain that relationship but was denied the opportunity.

At a readiness hearing on September 20, 2019, appellant represented she was contesting the petition and was appointed counsel. The parties acknowledged to the court they had received copies of the investigator's report.

4.

At a further readiness hearing on December 13, 2019, appellant requested the court order a relationship study be conducted between appellant and B.D., and the court granted appellant's request.

On February 3, 2020, respondent filed a second amended petition to declare B.D. free from parental custody and control. The contents of the petition were identical to the first amended petition; the only amendment was the addition of Probate Code section 1516.5 to the caption of the pleading.

The court conducted the contested hearing on the petition on October 29, 2020. Charre E. Kashwer, Ph.D., the clinician who conducted the relationship/bonding study, testified on behalf of respondent. Kashwer testified that she met with appellant, respondent and her husband, and B.D. in May and June 2020. B.D. was four years old at the time and able to communicate with Kashwer using language, speaking one- and two-word sentences. According to Kashwer, B.D. did not know appellant was his biological mother nor "that she exists" and believed respondent and her husband were his biological parents. Kashwer explained that because B.D. had not seen mother since he was one and a half years old, based on literature in Kashwer's field of study, he would have no memory of her. For this reason, she concluded B.D. and appellant did not have any meaningful relationship she could evaluate.

Respondent testified she and her husband had been married for eight years and that they were both employed. She described B.D. as a "special needs" child. Though he is deaf in both ears, he can hear because of his cochlear implants and uses English as his primary language and American Sign Language (ASL) as a supplement; he was "somewhat delayed" and spoke in one- to two-word sentences. Respondent stated she and her whole family were "fluent" in ASL. Respondent further testified B.D. had a "great" relationship with respondent's biological 12-year-old daughter, explaining that B.D. "always" wanted to be with her and believed her to be his sister. When respondent and her husband were both working, respondent's mother provided child care for B.D.

5.

Respondent explained B.D.'s medical issues required her to take him to UCLA Medical Center "approximately 26 times" and that he had had surgery for craniosynostosis, requiring follow up appointments every six months.

Respondent testified she did not allow any visitation with mother after August 2017 and never showed B.D. pictures of appellant nor talked to him about appellant. She denied that appellant ever offered to provide anything for B.D. and that she declined any offers. Though appellant filed petitions for visitation and to terminate the guardianship in the guardianship case in March 2019, she ultimately failed to prosecute the request.[4] It was respondent's intent to adopt B.D. if her petition were to be granted.

Appellant testified she had a drug problem and entered rehab in 2017 and lived in a sober living facility upon completing the program. She attended 12-step meetings from 2017 to 2018. She had not used illegal drugs since 2017. Prior to placing B.D. in respondent's care, appellant provided for B.D.'s basic necessities and medical care. Appellant learned "baby sign language" after B.D. was born and completed a sign language course in December 2019. She felt placing B.D. in respondent's care was further evidence of her good parenting and that respondent was the best person for B.D.

Appellant testified she "underst[ood] that [respondent] is the best choice right now for [B.D.], but I just don't know if that's forever." She went on to say she did not want to lose her parental rights, but she "d[id not] want to take [B.D.] from [respondent]; not right now, not any time soon at all." Appellant explained the reason she did not want her parental rights terminated was so she could see or have visitation with B.D. in the future. She further stated it was "[a]bsolutely" best for B.D. to remain with respondent. She stated, "What I feel is right now the best thing for [B.D.] is to be with [respondent]. But I

---

**4**    The record on appeal has been augmented to include the record of the related guardianship case. The guardianship case record indicates that appellant appeared at two hearings on her petitions and subsequently failed to appear at three consecutive hearings thereafter. Appellant was advised her failure to appear would result in dismissal of her petitions and on June 29, 2020, the date of her third failure to appear, the court dismissed the petitions.

don't ever want to be denied to be able to visit him or be able to get pictures [of] him or just any kind of update. But right now in [respondent's] care is where he belongs and where he would be most taken care of. Absolutely."

Appellant never requested formal visitation through court until March 2019 because she was unaware she could; she "figured [respondent] knew what was best and that what [respondent] told [appellant] was true." Appellant trusted respondent's judgment. Appellant did not offer any clothing, toys, money, or any other items to respondent for B.D.

The court took the matter under submission and issued a written ruling on November 4, 2020, granting respondent's petition to free B.D. from the custody and control of both parents. In its ruling, the court noted B.D. considered respondent and her husband his biological parents, was bonded to their biological daughter and respondent's mother, and had no memory of appellant. The court stated it had before it no evidence as to how long appellant attended rehab and no evidence, besides appellant's testimony, that she completed it. The court explained that the certificate of completion appellant provided to the court indicated a completion date of July 2, 2017, which was the same time appellant left B.D. in respondent's care, so it was "of little help." The court further noted though appellant requested to see B.D., she "deferred to" and "did not question" respondent's judgment. The court noted that although appellant filed a petition to terminate the guardianship or establish visitation in March 2019, she failed to follow through, and after "several continuances and her failures to appear[,] her petition was dismissed." The court pointed out that appellant's own testimony established she did not want to terminate the guardianship and that it was in B.D.'s best interest to remain with respondent. Judgment was entered on January 4, 2021.

## DISCUSSION

**I. Alleged Failure to Read and Consider the Investigator's Report**

In proceedings under both Family Code section 7822 and Probate Code section 1516.5, an investigative report must be rendered to the court with a recommendation of the proper disposition. (Fam. Code, § 7851, subd. (a); Prob. Code, § 1516.5, subds. (a) & (b).) "The court shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment." (Fam. Code, § 7851, subd. (d).) While the statutory language indicates a court's obligation to formally receive the report in evidence under this code section is dependent upon a motion by one of the parties, the trial court has an independent sua sponte obligation to read and consider the investigator's report. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 169.)

Here, no party moved to admit the investigator's report into evidence, but appellant argues that the trial court did not fulfill its sua sponte obligation to read or consider the report because its written ruling did not mention specific facts, interviews, conclusions, or recommendations from the report.

Though appellant did not make any objection regarding the investigator's report below, because the trial court has a sue sponte obligation to read and consider it and because the investigator's report is a procedural protection calculated to promote the child's best interest, we decline to find appellant has forfeited her claim and review it on its merits. (See *Neumann v. Melgar*, *supra*, 121 Cal.App.4th at pp. 164, 169.) We conclude her claim fails.

Appellant primarily relies on *Neumann v. Melgar*, where the appellate court found a trial court's failure to read and consider the investigator's report was error. *Neumann v. Melgar* is distinguishable. There, the appellate court concluded that the trial court had not reviewed the investigator's report in part because no party requested the court to consider it, and the trial court's own statements indicated that it had not reviewed it. The trial court in that case commented it had initially thought it read the report, but as the

"record did not reflect such a review," it was "willing to defer to the record" and recalled that the report was "outdated." (*Neumann v. Melgar*, *supra*, 121 Cal.App.4th at pp. 168–169.)

In contrast, there are no such statements by the trial court in the present case indicating it did not review or did not remember the report. Rather, the record contains evidence supporting the contrary inference. At a hearing on September 30, 2020, the first before the judge who ultimately ruled on the petition, the court inquired if "we receive[d] a report" and subsequently indicated it had located the report in its file. On October 29, 2020, the day of the contested hearing, the court referred to contents of the report in open court. During a discussion on that date initiated by appellant's counsel on the propriety of respondent's inclusion of Probate Code section 1516.5 as a ground in her petition, the court noted "[Probate Code section] 1516.5 was addressed in the investigation on the recommendation that was filed on September 13, 2019?," which indicates the court had read the report.

Further, appellant's counsel referred to respondent's statements to the investigator during her cross-examination of respondent and referred to the investigator's report in her closing argument at the contested hearing. Notably, the court requested transcripts of the testimony from the reporter before taking the matter under submission.

Finally, the court referred to the report in its written ruling, indicating it had been filed and noted it contained issues under both Family Code section 7822 and Probate Code section 1516.5. The court also, through its written ruling, ordered payment to the investigator in the amount specified within the contents of the report, which as respondent points out, was information that did not appear anywhere else in the record. The foregoing all indicate the trial court read and was familiar with the contents of the investigator's report, and there is no indication it did not take it into account when making its ruling.

We presume the court follows the law. (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563.) We are not persuaded, in light of the foregoing, the court's failure to mention the investigator's recommendation or any facts unique to the investigator's report adequately rebuts this presumption. Further, as no party moved to admit the investigator's report into evidence, we do not view the trial court's failure to receive it into evidence as an indication it did not follow its obligation to read and consider it. (See *Neumann v. Melgar*, *supra*, 121 Cal.App.4th at p. 169.)

Though we conclude from the record the trial court fulfilled its duty to read and consider the investigator's report, we note, even if it did not, appellant has not demonstrated prejudice to persuade us reversal is necessary.

Complete failure to read and consider the investigator's report is not reversible per se. (*Neumann v. Melgar*, *supra*, 121 Cal.App.4th at p. 169 ["The failure to consider the evaluator's report [in that case] was … *prejudicial* error." (Italics added.)]) The presumption in the California Constitution is that the "improper admission or rejection of evidence, or … any error as to any matter of procedure," is subject to harmless error analysis and must have resulted in a "miscarriage of justice" in order for the judgment to be set aside. (Cal. Const., art. VI, § 13.) Even if we assume for the sake of appellant's argument the trial court did not read or consider the investigator's report, appellant has not demonstrated a miscarriage of justice.

Appellant suggests the alleged failure to read the report resulted in the court's being unaware of certain facts that "put into question" the best interest of B.D., including respondent's "concerted efforts to interfere with [a]ppellant's ability to reestablish the relation[ship] she had previously enjoyed with her son." Appellant states, "According to the investigator's report, it appears evident that [respondent] had undertaken these efforts based only on her unilateral determination that [a]ppellant was too unstable and not fit to parent [B.D.]"

Appellant fails to acknowledge that the evidence before the trial court, absent the investigator's report, effectively established these facts. It is undisputed respondent did not allow visitation after August 2017 despite appellant's requests, and that this decision was based on respondent's own judgment. Respondent testified at trial that appellant would message her regularly and that she denied contact, explaining she "d[id] not feel that it was in the best interest of [B.D.] being contacted [by appellant]." Respondent further testified she had never showed B.D. pictures of appellant or talked to him about her. Appellant testified she was not allowed visitation and that respondent had informed her the reason was because it was not in B.D.'s best interest. Kashwer testified respondent told her she did not allow contact with appellant because of appellant's "instability" and B.D.'s "educational, emotional needs." Appellant's counsel reiterated that respondent did not allow visitation in her closing argument.

Further, it is unlikely, based upon our review of the record and the court's written ruling, that consideration of any facts unique to the report or the investigator's recommendations affected the court's ultimate decision to grant the petition. The investigator recommended the petition be denied on grounds of abandonment based on appellant's attempts at visitation and offers of support, and respondent's rejection of both. As we have stated, the testimony well established appellant's undisputed attempts at contact with B.D. and respondent's denial. The testimony gave the court more insight into the issue, as appellant testified she deferred to respondent's judgment on whether she should have contact with B.D., and though appellant requested formal visitation in March 2019, she failed to follow through with her request. Though the investigator's report indicated respondent based her decision not to allow her to see B.D. on her own conclusions regarding appellant's insobriety, the court noted it was not persuaded by the evidence presented at trial that appellant completed a rehabilitation program subsequent to placing B.D. with respondent. Further, as for whether appellant offered material or monetary support, the live testimony directly contradicted the investigator's statements.

11.

Respondent denied rejecting any support from appellant and, more compelling, appellant testified she never offered any type of item or money to respondent on behalf of B.D.

On the Probate Code section 1516.5 issue, the investigator concluded it was not in the best interests of B.D. to be adopted by respondent. The court heard thorough live testimony on this topic, including, perhaps most persuasive, appellant's own testimony that B.D.'s placement with respondent was in his best interest at the time of the hearing and for the foreseeable future. The trial court appeared to give significant weight to this testimony in its consideration of B.D.'s immediate interest in a permanent home. The probative value of the investigator's report was low in the context of the court's evaluation of the live testimony of the parties.

Based on the foregoing, we conclude the contents of the report would not have had a substantive effect on the trial court's ultimate conclusion. Even if the court did not read and consider the investigator's report, we find no miscarriage of justice; thus, even if we were to find error, it was harmless.

## II.     Failure to Appoint Counsel for Minor

In proceedings to free a child from parental custody and control, a court is required to consider whether the interests of a child require the appointment of counsel, and "[i]f the court finds that the interests of the child require representation by counsel, the court shall appoint counsel …." (Fam. Code, § 7861; see Prob. Code, § 1516.5, subd. (a) [applying procedure from Fam. Code, § 7800 et seq.].)

The California Supreme Court has explained "[i]t is … likely that in a particular case the court will be fully advised of matters affecting the minor's best interests, and little assistance may be expected from independent counsel for the minor in furtherance of his client's or the court's interests." (*In re Richard E.* (1978) 21 Cal.3d 349, 354 (*Richard E.*) [construing statutory predecessor].) However, a court's discretion is somewhat limited in that "when the court finds a child has separate interests not protected in the contest between parents and a petitioner, the court must exercise its discretion by

12.

appointing separate counsel" and, where there is an "absence of a showing on the issue of the need for independent counsel for a minor, failure to appoint constitutes error." (*Ibid*.; accord, *Neumann v. Melgar*, *supra*, 121 Cal.App.4th at p. 171 ["Where there has been no showing one way or the other …, the court's failure to appoint counsel is deemed *erroneous*."].)

Here, the issue of whether to appoint counsel for B.D. arose twice during the proceedings. On July 5, 2019, the court noted that B.D. was going to be turning four years old later that year and that his "best interests doesn't require the appoint[ment] of minor's counsel, at least based on what I know right now." On September 20, 2019, a week after the investigator's report was filed, the court noted it had previously found that the best interest of B.D. did not require it to appoint minor counsel and asked if there was "[a]ny reason to revisit that finding." Respondent's counsel responded "I don't believe so," and appellant responded "No, thank you."[5]

Appellant contends that despite raising the issue, the court erred by failing to appoint minor counsel because there was no showing that B.D.'s interests were protected by one or more of the parties.

Though appellant did not request the trial court to appoint counsel for B.D. and did not object to how the trial court handled the issue below, because the decision to appoint independent counsel to a minor is a procedural protection calculated to promote the best interest of the child, we will review the merits of appellant's claim. (See *Neumann v. Melgar*, *supra*, 121 Cal.App.4th at pp. 163–164.)

We need not determine whether the representations of the parties and/or the information in the pleadings and investigator's report constituted a sufficient showing on which the trial court could decline to appoint counsel for B.D. because we conclude any

---

[5] Appellant was appointed counsel at this hearing, but it does not appear her counsel was present at the time of appointment.

error for failing to appoint counsel for B.D. was harmless based on our review of the entire record.

"[F]ailure to appoint counsel for a minor in a freedom from parental custody and control proceeding does not require reversal of the judgment in the absence of miscarriage of justice." (*Richard E.*, *supra*, 21 Cal.3d. at p. 355.)

Appellant contends the record demonstrates respondent could not adequately represent B.D.'s interests because she prevented B.D. from seeing appellant and did not speak of appellant to B.D.. Appellant overlooks the fact that B.D.'s interest in a relationship with his biological mother, despite respondent's decision not to allow appellant to visit B.D., was fully represented during the proceedings.

The judgment in the present case followed a contested hearing at which appellant was represented by counsel. (Cf. *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617, 625–626 [failure to appoint counsel for minor was a miscarriage of justice where petitions were uncontested because the trial court had barred the mother from participating in the hearing].) Appellant testified as to her relationship with B.D. prior to leaving him in respondent's care as well as her efforts to maintain or rebuild a relationship with him. She was free to cross-examine respondent on the reasons she did not allow visitation. A court-ordered bonding study of appellant's and B.D.'s relationship was conducted at appellant's request, and the court-appointed clinician testified at the hearing as to the results of the study, which included interviewing B.D. and compiling information from both respondent and appellant.

Like in *Richard E.*, where the court found no miscarriage of justice resulting from the court's failure to appoint counsel for the minor, the trial court here "made its judgment with full knowledge of family relationships affecting [appellant and B.D.]," and "had before it all factual matters which may have persuaded it that [B.D.'s] interests would be best served by not depriving [appellant] of custody." (*Richard E.*, *supra*, 21 Cal.3d. at pp. 355–356, fn. omitted.) The record in the present case "discloses and

[appellant] suggests nothing which independent counsel for the minor might have done to better protect [B.D.'s] interests." (*Id*. at p. 355.)

Any error is harmless.

**DISPOSITION**

The January 4, 2021 order freeing B.D. from the custody and control of his biological parents is affirmed.


MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.